**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

BENJAMIC GRICE, and           )
KAYLA PATCHETT,           )
           )
        Plaintiffs,     )
           )
v.           )     Case No. 16-CV-459-GKF-FHM
           )
CVR ENERGY, INC., CVR REFINING,  )
LP, FLOWSERVE CORPORATION,   )
FLOWSERVE US, INC., DOUG    )
RICHISON, and JOHN DOE     )
ENGINEERING COMPANY,    )
           )
        Defendants.   )

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment [Doc. No. 79] of defendants CVR Energy, Inc. and CVR Refining, LP.  For the reasons set forth below, the motion is granted.

### I. Background

This dispute arises from an explosion at an oil refinery in Coffeyville, Kansas on July 29, 2014.  As a result of that explosion, one refinery worker was killed, and three others were severely burned.  The refinery—owned by Coffeyville Resources Refining & Marketing, LLC ("CRRM")—is an operating subsidiary of CVR Refining and indirectly owned subsidiary of CVR Energy (collectively, "CVR").  [Doc. No. 80, p. 12, ¶ 7] (noting that "CVR Energy owns 66% of CVR Refining" and "CVR Refining owns 100% of CRRM").  On December 31, 2012, CVR executed a Services Agreement to provide subsidiaries—including CRRM—certain services, including safety advice and asset management.  [Doc. No. 43-7, p. 31].

Plaintiffs previously moved for partial summary judgment on grounds that the Services Agreement obligated CVR to provide a safe working environment for CRRM employees. Specifically, plaintiffs argued that CVR assumed responsibility for the operation and safety of P-

2217, a pump whose seal failure triggered the explosion in this case. The court denied that motion on March 23, 2017. *Rigdon v. Flowserve Corp.*, No. 16-CV-81-GKF-FHM, 2017 WL 1100904 (N.D. Okla. Mar. 23, 2017). It held that "genuine issues of material fact exist[ed] as to: (1) whether the parties intended the Services Agreement as a safety services contract or cost-allocation mechanism; and (2) if a safety services contract, the scope and nature of the duties owed by [CVR] to CRRM employees." *Id.* at *4. CVR addresses those questions now and moves for summary judgment. It argues that that the Agreement—as a cost-allocation arrangement for management services—does not establish a safety duty to CRRM employees, generally, or with respect to P-2217, specifically.

## II. Standard of Review

Summary judgment shall be granted if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a rational trier of fact to resolve the issue either way. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 670 (10th Cir. 1998). A fact is "material" if it is essential to the outcome of the case. *Id.* On review, a court must examine the record in the light most favorable to the non-movant. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). But the interpretation of a contract is a question of law that may properly be determined on a motion for summary judgment. *See Cargill Meat Solutions Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1343 (D. Kan. 2016).

## III. Analysis

Under Kansas law, an employer owes a non-delegable duty to provide employees a safe workplace. *See Allen v. Shell Petroleum Corp.*, 68 P.2d 651, 657 (Kan. 1937); *accord Howard v. TMW Enter., Inc.*, 1998 WL 404358, at *2 (D. Kan. July 8, 1998). To that end, a corporation is

not responsible for the working conditions of a subsidiary's employees solely on the basis of a parent-subsidiary relationship.  *See Smith v. Atl. Richfield Co.*, 814 F.2d 1481, 1488 (10th Cir. 1987); *Miller v. NEP Grp., Inc.*, No. 15-CV9701-JAR, 2017 WL 2151843, at *8 (D. Kan. May 17, 2017).

An entity that voluntarily "undertakes to improve safety for [ ] workers," however, "becomes potentially liable under § 324A" of the Restatement (Second) of Torts.  *See Malkiewicz v. R.R. Donnelly & Sons Co.*, 703 F. Supp. 49, 51 (W.D. Tenn. 1989); *Miller*, 2017 WL 2151843, at *8; *Schmeck v. City of Shawnee*, 651 P.2d 585, 597 (Kan. 1982) (adopting § 324A as basis for liability).  Such liability "might originate in a contractual duty."  *See First Nat'l Bank of Camden, Ark. v. Tracor, Inc.*, 851 F.2d 212, 214  (8th Cir. 1988); *see also Ingram v. Howard-Needles-Tammen & Bergendoff*, 672 P.2d 1083, 1088 (Kan. 1983); *Johnson v. Bd. of Cty. Com'rs of Pratt Cty.*, 913 P.2d 119, 130 (Kan. 1996).

Here, CVR contracted to provide safety advice to CRRM.  By its plain terms, the Services Agreement was made "for the benefit" of certain refining subsidiaries, including CRRM.  [Doc. No. 43-7, p. 1].  Specifically, CVR agreed "to provide certain services necessary to operate the business conducted by the" refining subsidiaries, including "safety and environmental advice," "manage[ment]" of "day-to-day business and operations, including managing [   ] liquidity and capital resources," "compliance with applicable law," and asset management.  [*Id.* at 1, 31].  Such services were required to conform to applicable laws and industry standards.  [*Id.* at 5] ("The Services shall be provided in accordance with . . . applicable material Governmental Approvals and Laws . . . [and] applicable industry standards.").  In return, CVR received $13.6 million in 2013 and 2014.

3

Plaintiffs argue that, in the Services Agreement, CVR assumed a duty to provide a safe working environment for CRRM employees.  Specifically, plaintiffs contend CVR assumed responsibility for P-2217.  CVR disputes that characterization.  For the reasons set forth below, the court concludes neither the Service Agreement nor CVR's actions establish a basis for liability under § 324A of the Restatement (Second) of Torts.

*First*, the provision of safety advice does not give rise to a duty.  To establish a duty under § 324A, "[n]either mere concern with nor minimal contact about safety matters" will suffice.  *See Muniz v. Nat'l Can Corp.*, 737 F.2d 145, 148 (1st Cir. 1984); *Miller*, 2017 WL 2151843, at *8.  Rather, a parent company must take affirmative steps to provide safe working conditions at a subsidiary.  *See Muniz*, 737 F.2d at 148.  In other words, the test is not whether CVR had *any* control of CRRM's operations, but whether it controlled the injury-causing aspect of the refinery operation to such a degree that it directed how that activity should or should not be performed.  *See Wayts v. Peter Kiewit Sons, Inc.*, 936 F.2d 584 (Table), at *2 (10th Cir. 1991) (unpublished); *Loreda v. Solvay Am., Inc.*, 212 P.3d 614, 624 (Wyo. 2009).

For that reason, "[c]ase law precludes [an] inference of control by [a parent company] where it operated merely in an 'advisory' role."  *See Loreda*, 212 P.3d at 625; *Wayts*, 936 F.2d 584 (Table), at *2.  Non-binding terms like "advice" "are consistent with a parent/subsidiary relationship," and without more, do not give rise to an inference of direct control.  *Cf. Atl. Gas Light Co. v. UGI Util., Inc.*, No. 3:03-cv-614-J-20MMH, 2005 WL 5660476, at *9 (M.D. Fla. Mar. 22, 2005) (evaluating parent-subsidiary control in CERCLA context); *see also* Black's Law Dictionary 62 (9th ed. 2009) (defining "advice" as "[g]uidance by one person . . . to another"); *Wayts*, 936 F.2d 584 (Table), at *2.  In short, the "retention of an advisory role is not sufficient to" impose liability under § 324A.  *See Wayts*, 936 F.2d 584 (Table), at *2.

That rule makes functional sense.  As an analytical matter, it is difficult to define the scope of § 324A liability in advisory contracts.  That is to say, it is difficult to know, *ex ante*, what responsibilities such a contract imposes.  Must advice be given on all safety matters, or only some?  What differentiates matters that deserve attention from those that don't?  Should an advisor monitor compliance with its safety recommendations?  And what is the advisor's responsibility when advice is not followed?  Hindsight is 20/20, and the Services Agreement requires CVR to be an advisor, not an oracle.  Not everything that goes wrong can be laid at its feet.  *See Roe ex rel. Roe v. Dep't of Soc. & Rehab. Servs.*, 80 P.3d 1162, 1171 (Kan. Ct. App. 2004) (explaining that "Kansas courts have been slow to see an undertaking sufficient to create a duty").  That is especially so for non-delegable duties, like CRRM's workplace safety duty here.  That is why Kansas requires plaintiffs to show that CVR either gave advice that increased the risk of harm, assumed the operation, safety, and control of P-2217, or otherwise caused CRRM to neglect its safety operations.  *See Hoskinson v. High Gear Repair, Inc.*, 982 F. Supp. 2d 1210, 1223–25 (D. Kan. 2013); *Deines v. Vermeer Mfg. Co.*, 752 F. Supp. 989, 993–97 (D. Kan. 1990).

Plaintiffs have not made that showing here.  Nothing in the record suggests CVR provided incompetent safety advice or instructed CRRM to disregard pump replacement recommendations.  In fact, CVR seems to have been unaware of any safety issue with P-2217 at all.  [Doc. No. 80-10, p. 3] (Swanberg Deposition) ("[Q.] [D]uring the entire time you were providing services to Coffeyville, you never reviewed, [and were] never involved in review of the 2010 Isom Unit PHA Revalidation?  A. Not of this one specifically, no."); [Doc. No. 80-3, p. 6] (DeVelasco Deposition) ("[Q.] Did you find the slightest indication that any corporate employee in Sugar Land before the incident, spent a single minute reviewing the 2010 Process Hazard Analysis report?  A. I don't have any indication of that."); [Doc. No. 80-7] (Haugen

Deposition) ("Q. The particular revalidation completed in 2010, did you review the final report? A. No.").

To be sure, CVR offered strategic direction, developed general safety policies, offered technical support, and monitored compliance with general OSHA safety regulations. But "[p]roviding general safety [support] is insufficient to show that a parent corporation affirmatively assumed [a] responsibility" under § 324A. *See Miller*, 2017 WL 2151843, at *8. That is true even though CVR "advised [CRRM] regarding safety matters [and] injury prevention," "prepared a safety manual," and "monitor[ed] compliance with general company-wide safety policies and federal regulations." *See Wayts*, 936 F.2d 584 (Table), at *2; *see also Richmond v. Indalex, Inc.*, 308 F. Supp. 2d 648, 663–64 (M.D.N.C. 2004) (granting summary judgment to parent company on § 324A claim that promulgation of safety procedures established a duty).

In simplest terms, CRRM "had its own safety program and . . . director over which [CVR] had no direct authority." *See id.* CRRM owned and operated refinery property and machinery, [Doc. No. 54-9, ¶ 6]; had its own safety department, manager, and personnel, [Doc. No. 80-4]; and conducted its own inspections and repairs, [*id.*]; [Doc. No. 80-5]. Those activities encompassed maintenance of the isomerization unit and P-2217, specifically. [Doc. 80-5]. And that is unsurprising. The plain text of the Services Agreement provides that "[p]ersonnel performing the actual day-to-day business and operations of" CRRM "will be employed by" CRRM. [Doc. No. 43-7, p. 22].

In contrast, CVR performed none of these duties, serving instead in a purely advisory capacity. [Doc. No. 80-5]; [Doc. No. 80-3, p. 10–11]; [Doc. No. 80-7, p. 3]. No evidence demonstrates that CVR attempted "to relieve [CRRM] of the responsibility for detecting safety

hazards in [its] equipment and instituting remedial measures[.]" *See Rick v. RLC Corp.*, 535 F. Supp. 39, 46–47 (E.D. Mich. 1981); *see also Richmond*, 308 F. Supp. 2d at 664 (granting summary judgment where plaintiff "failed to allege that [parent] usurped [its subsidiary's] responsibility for the safety of [the subsidiary's] employees"). Thus, because plaintiffs have not identified specific negligent advice, reliance, or control, summary judgment is appropriate. *See Wayts*, 936 F.2d 584 (Table), at *2; *Miller*, 2017 WL 2151843, at *8; *Ramirez v. Becton Dickinson & Co., S.A.*, 839 F.2d 1, 7 (1st Cir. 1986) (affirming directed verdict on duty issue where evidence showed only that a parent company was aware of safety problems at a subsidiary, provided some assistance in evaluating and inspecting safety conditions, and was involved in the initial design of the plant, not subsequent operations).

*Second*, none of the other services performed by CVR give rise to a duty. As a general matter, the mere existence of a services agreement does not establish that a parent company "assumed management responsibility to provide a safe workplace" at a subsidiary. *See Fletcher v. Martin Elec., Inc.*, 825 F.2d 301, 303 (11th Cir. 1987). Fee-for-service arrangements are common in parent-subsidiary relationships. *See Hamilton v. Brad Systems, Inc.*, 2006 WL 2522560, at *10–11 (D. Kan. Mar. 24, 2006) (declining to impose single employer liability on parent-subsidiary entities on the basis of fee-for-service agreement); *In re Western States Wholesale Natural Gas Antitrust Litig.*, No. MDL 1566, 2009 WL 455658, at *11 (D. Nev. Feb. 23, 2009) (denying alter ego relationship where parent corporation acted as the "managing agent" of a subsidiary). The inquiry, then, is whether the services provided or contracted-for supplant a subsidiary's safety responsibilities. *Supra*, at 4–5. In other words, plaintiffs must "plead an independent act of negligence by [CVR]" that does "not pertain to [CVR's] management of [CRRM]." *See McGehee v. Sw. Elec. Energy Corp.*, No. CIV-15-145-C, 2015

WL 9413889, at *2 (W.D. Okla. Dec. 22, 2015); *see also Love v. Flour Mills of Am.*, 647 F.2d 1058, (10th Cir. 1981) (requiring independent act of negligence).

Plaintiffs have not done so.  Some activities—even where formalized under a services agreement—do not distort the parent-subsidiary relationship.  Such activities generally include monitoring a subsidiary's performance, supervising a subsidiary's finance and capital budget decisions, and articulating general policies and procedures.  *See United States v. Bestfoods*, 524 U.S. 51, 72 (1998) (evaluating parent-subsidiary relationship in CERCLA context) (quotation marks and citation omitted).  Thus, to establish duty, CVR's activity towards CRRM must be "eccentric"—that is, different from ordinary oversight "in degree and detail."  *See id.*

Plaintiffs argue *Bestfoods* and its progeny are inapplicable to this case insofar as she does not seek to pierce the corporate veil.  [Doc. No. 90, p. 32].  Plaintiffs are correct that *Bestfoods* was decided in the veil-piercing context.  But its discussion of the ordinary division of labor between parents and subsidiaries is relevant to this case as well.  To establish liability under § 324A, plaintiffs must prove "a level of control beyond the ordinary involvement of a parent . . . in the affairs of its subsidiaries."  *See Spires v. Hosp. Corp. of Am.*, 289 F.App'x 269, 272 (10th Cir. 2008).  And that is true regardless of whether a duty is assumed gratuitously or by contract.  Restatement (Second) of Torts § 324A ("One who undertakes, gratuitously or for consideration, to render services . . . which he should recognize as necessary for the protection of a third person . . . is subject to liability . . . for physical harm resulting from his failure to exercise reasonable care.").  In either case, where a parent company performs services for a subsidiary, it is important to distinguish ordinary oversight responsibilities from special protective undertakings.  *See supra*, at 2–7.  For these reasons, *Bestfoods*'s discussion of parent-subsidiary relationships helps the court in its liability analysis.

Here, the record evidences no action by CVR extending beyond general corporate oversight and management. At a general level, the obligations imposed by the Services Agreement—controlling budgets, general supervision, promulgating company-wide policies, selecting venders, making purchases, and providing management support—do not implicate a safety duty. *See Bestfoods*, 524 U.S. at 72. That is consistent with the safety advisory role contemplated by the Agreement for CVR. At a specific level, none of the activities identified by plaintiffs give rise to a duty under § 324A or any other principle of liability. For one thing, control over CRRM's capital budget "does not create a duty on the parent of [CVR] to ensure safety or prevent injuries to [CRRM] employees." *See Waste Mgmt. Inc. v. Superior Court of San Diego Cty.*, 13 Cal. Rptr. 3d 910, 915 (Cal. App. 2004); *see also Bestfoods*, 524 U.S. at 72. Indeed, "several courts have acknowledged that it is entirely appropriate for a parent corporation to approve major capital expenditures of its subsidiaries." *See Joiner v. Ryder System Inc.*, 966 F. Supp. 1478, 1485 (C.D. Ill. 1996) (collecting alter ego cases). For another, "courts generally presume that [   ] directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *See Bestfoods*, 524 U.S. at 69. It is not enough to establish that "dual officers and directors made policy decisions and supervised [some] activities at the" refinery. *See id.* at 69–70; *accord Raythean Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1217–18 (10th Cir. 2003).

In this case, the Services Agreement does not assign eccentric or specific safety duties to CVR; and it seems only to provide a cost-allocation mechanism for shared services. Indeed, uncontroverted testimony shows that the Agreement contains guidelines and methodologies for calculating and assigning the cost of centralized management and administrative functions performed by shared personnel. [Doc. No. 54-4]. Because that does not prove "a level of

9

control beyond the ordinary involvement of a parent . . . in the affairs of its subsidiaries," plaintiffs cannot establish § 324A liability under Kansas law.  *See Spires v. Hosp. Corp. of Am.*, 289 F.App'x 269, 272 (10th Cir. 2008).

WHEREFORE, CVR's Motion for Summary Judgment [Doc. No. 79] is granted.

IT IS SO ORDERED this 17th day of July, 2017.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

10